IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FIL....

05 APR 20  PM 2: 5

ROBERT R. DI  .. CIO
CLERK, U.S. DI  .. CT.
W.D. OF TN, MEMPHIS

PATRICIA HERRING, MARY KURYLO,
and GLORIA TAYLOR,

      Plaintiffs,

v.                                                        No. 02-2994 B

INTERNATIONAL PAPER COMPANY,
ALL IP SEVERANCE PLANS and THOSE
PLANS' ADMINISTRATOR, JEROME M. CARTER,

      Defendants.

---

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD, DENYING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT, AND DISMISSING CASE

---

This lawsuit has been brought by the Plaintiffs, Patricia Herring, Mary Kurylo and Gloria Taylor, against their former employer, International Paper Company ("IP"), along with the IP Salaried Employee Severance Plan (the "Plan") and Jerome N. Carter, the Plan administrator, alleging violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1132(e), et seq. ("ERISA") and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, et seq. ("THRA"). On March 17, 2004, the Court granted the Defendants' motion for partial summary judgment as to the Plaintiffs' claims under the THRA and §§ 1140 and 1132(a)(3) of ERISA. In a scheduling order entered April 20, 2004, the Court directed the parties to submit their cross motions for judgment on the administrative record relative to the remaining issue in this case, denial of severance benefits.

The Plaintiffs were employed by IP in its Employee Service Center ("ESC") in Memphis, Tennessee. (Admin. R. at SP-0002.) As of December 31, 2001, the last date of their employment

45

at ESC, Herring was 57 years old and had 17 years experience with IP while Kurylo and Taylor were both 54 with 35 years of service. (Admin. R. at SP-0005.) It is not disputed that the Plan is an employee benefits plan governed by ERISA. (Compl. at ¶ 5.) In 2001, IP entered into an agreement with Exult, Inc. ("Exult"), a human resources and employee benefits outsourcing firm, for the purchase of ESC. (Admin. R. at SP-0016.) Prior to closing the sale, Exult offered the Plaintiffs, as well as other ESC employees, a position which they accepted. (Admin. R. at SP-0016-17.)

The Plaintiffs alleged in their complaint that at the time of the termination of their employment with IP all health and welfare benefits to which they were entitled as IP employees ceased. Moreover, they contended that, as long-term IP employees, they were fully vested in IP's pension plan and had anticipated future employment with the company in order to continue the accumulation and accrual of pension benefits so as to draw the maximum amount upon attaining full retirement age. Upon their termination from IP, their ability to accrue benefits under the pension plan ceased and they were not permitted to remain participants therein. Benefits offered by Exult were, according to the Plaintiffs, inferior to those available to employees of IP, a Fortune 500 company. The Plaintiffs insist some of their fellow employees received payments outside the Plan while they were forced to either face involuntary termination without receipt of severance benefits or employment with Exult at reduced benefits. The Plaintiffs filed claims with IP for severance benefits, which were denied. The instant lawsuit ensued on December 24, 2002.

Prior to reaching the merits of the parties' motions, the Court must as an initial matter address the request of the Plaintiffs that the administrative record be supplemented to include certain documents obtained by the Plaintiffs from Exult through a third-party subpoena. According to the Declaration of Carolyn Howard, counsel for the Plaintiffs, the subpoena was issued on April 15,

2003 and the documents were received on July 29, 2003. See Decl. of Carolyn Howard, Att'y for

Pls., Ex. A to Pls.' Statement of Undisputed Facts. As the materials were obtained by the Plaintiffs

after IP issued its decision on appeal, the documents could not have been presented to the

administrator on the original claim or the appeal. Thus, they cannot be considered by the Court in

this action. See Peruzzi v. Summa Med. Plan, 137 F.3d 431, 433-34 (6th Cir. 1998).

The Court now turns to the merits of the parties' claims. A participant in an ERISA-covered

plan may bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to

enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the

terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The standard of review in cases involving denial of

benefits under ERISA plans is well established.[1] "In cases in which a plan administrator is given no

discretionary authority by the plan, review of the plan administrator's decision by the district court

. . . is de novo, with respect to both the plan administrator's interpretation of the plan and the plan

administrator's factual findings." Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 616 (6th

Cir. 1998).

"When conducting a de novo review, the district court must take a 'fresh look' at the

administrative record but may not consider new evidence or look beyond the record that was before

the plan administrator." Id. The de novo standard "differs from the arbitrary and capricious standard

of review that is used when a benefits plan gives the plan administrator discretionary authority to

determine eligibility for benefits or to construe the terms of the plan." Id. at 616 n.4.

The arbitrary and capricious standard, by contrast, is the "least demanding form of judicial

---

[1]Although the Plaintiffs' pleading is captioned as a "motion for summary judgment," the
Court will convert the motion into one for judgment on the pleadings in accordance with
Wilkins.

review." Administrative Comm. of the Sea Ray Employees' Stock Ownership and Profit Sharing Plan v. Robinson, 164 F.3d 981, 989 (6th Cir. 1999), cert. denied, 528 U.S. 1114, 120 S.Ct. 931, 145 L.Ed.2d 810 (2000). "A decision regarding eligibility for benefits is not arbitrary and capricious if the decision is 'rational in light of the plan's provisions.'" Lee v. MBNA Long Term Disability & Benefit Plan, No. 04-3105, 2005 WL 705771, at *9 (6th Cir. Mar. 29, 2005) (citing Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988)). "Stated differently, 'when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.'" Id. (citing Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989)). "In interpreting a plan, the administrator must adhere to the plain meaning of its language as it would be construed by an ordinary person." Under this standard, the Court "must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants." Morgan v. SKF USA, Inc., 385 F.3d 989, 992 (6th Cir. 2004), pet. for cert. filed (73 U.S.L.W. 3540) (Mar. 4, 2005) (No. 04-1191). The existence of a conflict of interest, that is, where sponsor and administrator of the plan are the same entity as IP is here, "does not alter the standard, but should merely be considered as a factor in determining whether the plan administrator's decision was arbitrary and capricious." Recker v. Newcourt Credit Group, Inc., No. 02-2354, 2005 WL 513493, at *3 (6th Cir. Mar. 3, 2005). The Court in determining this matter is confined to reviewing only those materials presented to the administrator and its appeals committee. Peruzzi, 137 F.3d at 433-34.

The parties are not in agreement as to the appropriate standard of review to be applied in this case, with the Plaintiffs favoring a de novo review and the Defendants the arbitrary and capricious standard. The Plan provides that "[t]he plan administrator has the authority, responsibility and discretion to determine all questions of eligibility and status and has the right to interpret the

provisions of the Plan." (Admin. R. at SP-0095.) As the Plan clearly bestows upon the administrator discretionary authority as to eligibility, status and interpretation, the Court is required to analyze this matter under the arbitrary and capricious standard. See Marks v. Newcourt Credit Group, Inc., 342 F.3d 444, 457 (6th Cir. 2003) (plan providing that administrator "shall have the responsibility and discretionary authority to interpret the terms of the Plan, determine eligibility for benefits . . ." called for application of arbitrary and capricious standard).

Under the terms of the Plan, an employee is eligible for a termination allowance if her employment is ended because of

> [c]losing, relocation or sale of a facility that does not result in an offer of a position as of the date of closing, relocation or sale that the company deems suitable, either with the company, one of its subsidiaries or the purchaser of the facility in question; [or]

> [c]losing, relocation or sale of a facility that results in an offer of a position as of the date of the closing, relocation or sale that the company deems suitable, either with the company, one of its subsidiaries or the purchaser of the facility in question which requires relocation and which [she does] not accept. . .

(Admin. R. at SP-0093.) Conversely, a termination allowance is not payable upon

> [c]losing, relocation or sale of a facility that results in an offer of a position as of the date of closing, relocation or sale that the company deems suitable either with the company, one of its subsidiaries or the purchaser of the facility in question, which does not require relocation or which requires relocation and which you accept . . .

(Admin. R. at SP-0093.) A position is "suitable" under the Plan "if it is a position for which [the employee] is qualified based on [her] background, training or education." The acceptance of a position by an employee "is conclusive evidence of its suitability." (Admin. R. at SP-0094.)

In letters dated April 26, 2002, IP denied the Plaintiffs' initial claims for severance pay, stating in part as follows:

The Severance Plan provides for a termination allowance to be paid to an employee whose employment with International Paper has been involuntarily terminated due to certain specified events. The Severance Plan provides, in pertinent part, that in the event of the sale of a facility, an employee will be entitled to a termination allowance if such sale does not result in an offer of a position as of the date of sale that International Paper deems suitable, either with International Paper, one of International Paper's subsidiaries or the purchaser of the facility.   Under the Severance Plan, a terminated employee's acceptance of a position is conclusive evidence of its suitability.

Based on my knowledge of your individual situation, prior to the sale of International Paper's Employee Service Center business, you were made an offer by Exult, Inc., the purchaser of such business, which you accepted.  Accordingly, you received an offer of a suitable position in the sale of a facility and, under the terms of the Severance Plan, are not eligible for severance benefits.  Your claim for severance benefits is denied.

(Admin. R. at SP-0037 - 39.)

In his denial of the Plaintiffs' appeal, issued on October 22, 2002, Jim Renfrow, IP's benefit programs manager, noted with respect to the "suitability" of their employment with Exult and, therefore, ineligibility for severance benefits that "Ms. Herring, Ms. Kurylo, and Ms. Taylor all state, under oath in their June 25, 2002 Declaration, that they 'are all presently employed by Exult, Inc. in the unit that was formerly the Employee Service Center.  There is no dispute that [Plaintiffs are] qualified for [their positions] with Exult based on [their] background, training and education." (Admin. R. at SP-0017.)  The decision served the purpose of the Plan which was, he stated, "to provide an unemployment benefit for persons who are out of work as the result of a sale." (Admin. R. at SP-0017.)

It is undisputed that the Plaintiffs were offered positions with Exult and that they accepted those offers.  While the Plaintiffs do not agree with IP that the positions offered were "suitable," there is no evidence to suggest the Plaintiffs were not in fact qualified for the Exult positions "based

6

on their background, training or education." Moreover, since the Plan administrator was clearly aware of their acceptance of the positions offered at Exult, his finding that the Plaintiffs were ineligible was rational with respect to the Plan's provision that such acceptance by an employee "is conclusive evidence of [the position's] suitability." Thus, the plain language of the Plan clearly supports the administrator's findings. Indeed, the Plaintiffs appear to concede this point as they state in their dispositive motion that "IP's Plan Administrator strictly followed the terms of the Plan in regard to the three Plaintiffs." (Pls.' Mot. for Summ. J. and Mem. of Law in Supp. at 7.) Rather, the Plaintiffs' argument focuses less on the Plan provisions themselves and more on the fact that the denial of benefits was simply unfair, particularly in light of their long years of service to IP.

They refer the Court to the Second Circuit's decision in Gilbert v. Burlington Industries, Inc., 765 F.2d 320 (2d Cir. 1985), aff'd, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986), as applicable to them and supportive of a finding that the Plan "would require payment to the Plaintiffs, especially with the length of service they had." (Pls.' Mot. for Summ. J. and Mem. of Law in Supp. at 7.) The closest the case comes, however, to supporting the Plaintiffs' claims is a statement in dicta that "severance pay is often a reward for past service," relating to the question of whether the plan at issue was an employee welfare benefit plan under ERISA. Gilbert, 765 F.2d at 325. Gilbert falls far short of *requiring*, as the Plaintiffs suggest, payment of severance benefits for past service regardless of the Plan language.

Similarly, the other case substantially cited by the Plaintiffs, Bradwell v. GAF Corp., 954 F.2d 798 (2d Cir. 1992), is unsupportive. In Bradwell, the successor corporation absorbed the seller's severance pay policy. Bradwell, 954 F.2d at 801. The court, noting a statement by the Gilbert court that one objective of severance plans is "to reward employees for past service to the company,"

articulated that "[b]ecause BASF absorbed the Severance Pay Policy, and under it severance allowances upon layoff were to be based on continuous service including service to GAF, we do not perceive that employees' service to the company was in any way disregarded by GAF's denial of severance pay here." Id. The Plaintiffs argue that the premise applied in Bradwell should apply in this case but in reverse. That is, that since "Exult did **not** absorb the IP plan under which unvested severance allowances were based on continuous length of service, IP has disregarded all of these Plaintiffs' service to the company." (Pls.' Mot. for Summ. J. and Mem. of Law in Supp. at 7-8 (emphasis in original).) The obvious difference between the Bradford plan and that at bar is that the Plan in this case did not provide for severance allowances to be based on continuous service. The court in Bradwell did not require, as the Plaintiffs insist, that length of service must be considered in interpreting severance provisions or that a successor company's failure to adopt a severance plan which included consideration for length of service to the predecessor mandates a finding that benefits are payable.[2] This is a quantum leap the Court simply is not willing to make based on the language of Bradwell. It is further worth noting that both Gilbert and Bradwell were decided under the more stringent de novo standard of review.

The Plaintiffs also submit that the failure of IP to transfer the continued accrual of their pension benefits militates in favor of a finding of arbitrary and capricious decision making. The Plaintiffs point to Bedinghaus v. Modern Graphic Arts, 15 F.3d 1027 (11th Cir.), cert. denied, 513

---

[2]The court concluded that employees who retained their jobs under the new owner were not entitled to severance pay from their previous employer, as "employees do not retain any continuing right to severance payments after their operation is sold by their former employer." Bradwell, 954 F.2d at 801. The court indicated that its decision was "fortif[ied]" by the fact that the employees' service with the previous owner was recognized under the severance pay policy. Id.

U.S. 963, 115 S.Ct. 426, 130 L.Ed.2d 339 (1994), a decision also utilizing the de novo standard of review,[3] which the Court finds of little assistance to their case. In Bedinghaus, Times Publishing Company ("the Times") sold substantially all of the assets of its wholly-owned subsidiary, Modern Graphic Arts, Inc. ("MGA"), to another company which retained most of the former employees of MGA in the same jobs at the same salaries, but did not give credit for years of service with MGA for purposes of calculating severance benefits. Bedinghaus, 15 F.3d at 1028. The severance policy at issue provided that those discharged as "staffers" were entitled to benefits under the policy. Id. at 1029. The employee handbooks of the Times and MGA defined "staffer" as an employee of the Times and its affiliates, including MGA. Id. at 1029-30. The court found that, based upon the plain meaning of the plan's terms, the plaintiffs were entitled to severance pay "when their employment with MGA was terminated, regardless of whether they were employed by the entity that purchased MGA's assets." Id. at 1030. In noting that the plaintiffs lost credit for years of service with MGA, the court cited and distinguished Bradwell, stating that "[h]ere, we are faced with a situation in which plaintiffs' entitlement to severance pay was denied by MGA/Times and the new owner will not credit plaintiffs' past service to MGA/Times for severance pay purposes. We merely note that plaintiffs' loss of severance pay benefits is a *factor* we considered in reaching our conclusion that plaintiffs are entitled to benefits under either the Times' or MGA's severance pay policy." Bedinghaus, 15 F.3d at 1030 (emphasis added). Therefore, at best, Bedinghaus stands for the proposition that loss of benefits as a result of a sale is merely a factor the court may consider in a denial of benefits claim.

The Plaintiffs also cite Bedinghaus, along with Bellino v. Schlumberger Technologies, Inc.,

---

[3]In fact, the court in Bedinghaus quickly distinguished, with little if any analysis, cases cited by the parties in which the arbitrary and capricious standard was applied, stating that, for that reason, they were not helpful in deciding the case before it. Bedinghaus, 15 F.3d at 1032.

944 F.2d 26 (1st Cir. 1991), reh'g denied (Nov. 20, 1991), for the view that leaving them only with the choice of unemployment or a job at Exult automatically entitles them to severance pay. However, neither support such a position. In Bellino, the plaintiffs, originally employees of Schlumberger, became employed by National Semiconductor Corporation when the latter took over work previously performed by Schlumberger. Bellino, 944 F.2d at 30. Under Schlumberger's benefit plan, severance benefits were payable upon its termination of an employee. Id. The First Circuit, again on de novo review, found that "termination" under the plan was defined "broadly and encompasses those situations in which Schlumberger ceases to employ an individual. It is uncontested that Schlumberger ended its employment relationships . . . Additionally, there is no genuine dispute that [the] terminations were involuntary. Schlumberger did not give [the plaintiffs] the option to remain as employees; they were to choose either resignation or employment with [the successor]." Id. In Bedinghaus, the court, citing Bellino, concluded that the term "discharged" in the plan at issue included "those situations when an employee ceases to be a 'staffer,' that is, an employee of the Times or one of its affiliates. [The plaintiffs] were not given the option to remain with the Times or MGA; they had to choose either resignation or employment with the new owner." Bedinghaus, 15 F.3d 1030-31. Thus, in these cases, the payment of benefits turned on whether the plaintiffs' employment with the predecessor company had in fact ended. Evidence showing that employees were not given the option of staying with the previous employer after a sale is important to a court's determination under those circumstances. Here, however, severance pay was based upon the employee's failure to receive an offer of employment from the successor company, which was not the case with the Plaintiffs.

The Plaintiffs also aver that, while their claims were decided under the strict terms of the Plan, other employees received payments in contravention with the Plan, to their benefit.

Specifically, the Plaintiffs contend that payments were made to certain individuals who worked for ESC or IP's Mobile Kraft facility when they were sold by IP. With respect to the ESC employees, the payments were allegedly made pursuant to a "secret arrangement" known only to IP, Exult and the affected employees themselves. The fact that these payments were kept secret, even from the affected employees' managers, is indicative, Plaintiffs insist, of their inconsistency with the Plan provisions. The Plaintiffs also assert that the Defendants permitted Mark Azzarello, director of ESC who was offered a position with Exult, to remain with IP. Finally, they maintain that one ESC employee, Sue Grassl-Harms, was offered an enhanced retirement package even though she voluntarily retired and would not have been eligible for severance pay under the Plan. It is the position of the Plaintiffs that it was arbitrary and capricious for IP to permit these individuals to receive payment and to deny the Plaintiffs severance pay.[4]

The "secret arrangement" involved eight IP employees hired by Exult, including Linda Dalton, Cynthia Starnes, Jackie Hobson, Toya Tolliver, Toni Evans, Angela Bryant, Deedra Climer and Ossie Thomas. The Plaintiffs "assume" the existence of a special arrangement based upon the fact that these persons received a lump sum payment even though they did not qualify as 100% vested under IP's retirement plan. According to the Plaintiffs, five years of service was required for minimum vesting in the pension plan and these individuals had not attained the required five years vesting service with IP. The Plaintiffs aver that these payments must, then, have been a hidden form of "severance" not made available to them.

From the Plaintiffs' own assertions, it is clear they acknowledge that the terms of the Plan do

---

[4]While the Plaintiffs pointed in their appeal to other fellow employees whom they allege received preferential treatment, the Court will address only those persons referred to in the Plaintiffs' motion papers.

not apply to these individuals. Nor is there any suggestion that they were paid under the Plan or were entitled to any payment thereunder. Letters to each of the eight employees are included in the record and state, in pertinent part, as follows:

> The transition of the Employee Service Center to Exult resulted in the separation of ESC employees from International Paper effective December 31, 2001. As you know, this separation left you only six (6) days short of being vested in the Retirement Plan of International Paper Company ("Retirement Plan"). As a result, International Paper has elected to pay you a grossed-up lump sum distribution of the actuarial "net present value" of your unvested accrued pension.

(Admin. R. at SP-0058 - 0073.) Renfrow explained in his appeals decision that "[b]ecause these eight employees were within one month of vesting in their accrued benefits under the Retirement Plan, a business decision was made to compensate them for not vesting. This decision was approved by the appropriate senior management and was unrelated to the Severance Plan or its administration. If [the Plaintiffs] had been in a similar situation, the company may have considered addressing their situation." (Admin. R. at SP-0019.)

The Plaintiffs do not allege that they were in the same situation as those employees who received the grossed-up lump sum distribution. Moreover, the evidence presented by the Plaintiffs in support of their argument consists of a subpoena with attachments dated June 2004, some time after this lawsuit was filed. There is no indication that the attachments to the subpoena were part of the administrative record and, thus, the Court cannot consider them. See Peruzzi, 137 F.3d at 433-34.

The Plaintiffs have further maintained that nine former employees of the Mobile Kraft facility who, with IP's knowledge, had been offered and accepted positions with the purchaser of that unit on the date of the sale received enhanced severance benefits under the Plan, in direct contradiction

with the terms thereof, while the Plaintiffs were not afforded such consideration under the same circumstances.

In the appeal documents, Renfrow advised the Plaintiffs with respect to the Mobile Kraft employees that

> [d]uring the Mobile Kraft facility sale negotiations, the business lost one of its major customers. At the same time, the potential buyer would not commit to employ the existing workforce. With the downturn in business, International Paper decided to shut down the work at the facility. Employees were notified of the shutdown and were given WARN notices relating to this action. Due to this involuntary termination, the Mobile Kraft salaried employees were entitled to severance benefits under the Severance Plan. The fact that the buyer may have employed certain former International Paper employees subsequent to the sale does not affect their entitlement under the Severance Plan. . . . [T]his is a different location and different circumstances.

(Admin. R. at SP-0134.) The Plaintiffs contend in their motion that the "Defendants knew the identity of the employees who would be employed by the buyer of Mobile Kraft before the transition of that unit. Lists of those employees who had been offered employment by the buyer were submitted to IP's ESC before their termination." (Pls.' Statement of Undisputed Facts at 7.) The assertion is supported only by the June 2004 declaration of Plaintiff Herring and the lists referred to do not appear in the administrative record. Thus, as they were not before the Plan administrator, the documents cannot be considered. See Peruzzi, 137 F.3d at 433-34. In any case, there is no indication the Plaintiffs brought this allegation before IP in the claims process. See Killian v. Healthsource Provident Admin., Inc., 152 F.3d 514, 522 (6th Cir. 1998), reh'g denied (Aug. 7, 1998) ("There can be no dispute that in this circuit, in an ERISA claim contesting a denial of benefits, the district court is strictly limited to a consideration of the information actually considered by the administrator.").

The refusal of Mark Azzarello of a position with Exult in favor of remaining with IP was, according to the Plaintiffs, "evidence that IP did not keep the ESC organization intact or treat all employees in a similar pattern . . ." (Pls.' Mot. for Summ. J. and Mem. of Law in Supp. at 18.) They refer the Court to that portion of the administrative record containing Renfrow's notes, which indicated that Azzarello was asked during the appeals investigation why he did not move to Exult as a part of the sale. His reply was that "it is very common for any buyer to want to place its own person in charge of a newly acquired facility. IP and Exult both offered Mark positions; Mark elected to remain with IP." (Admin. R. at SP-0189.) Initially, the Court is unable to discern what connection Azzarello's situation has with the Plaintiffs' claim for severance pay, as there is no allegation he received payment under the Plan. Nor can the Court find, based on the evidence before it, that IP's decision to attempt to retain this management level employee was not rational.

The Plaintiffs next assert that IP employee Sue Grassl-Harms was offered severance payment, presumably guised as a "Flex-6 'enhanced' retirement package" even though she retired voluntarily and, therefore, should have been ineligible for severance benefits under the Plan. The Court cannot consider the Plaintiffs' allegations concerning Ms. Grassl-Harms, however, as they were not presented to the Plan administrator. See Killian, 152 F.3d at 522. Therefore, the Court cannot find that the decisions made by the Plan administrator in denying the Plaintiffs' requests for severance pay were arbitrary and capricious.[5]

Finally, the Plaintiffs' arguments based on alleged violations of ERISA regulations are also without merit. They submit that the Plan administrator failed to comply with Department of Labor

---

[5]Based upon the Court's finding that the administrator's decisions were not arbitrary and capricious, the Plaintiffs' contentions that the administrator's inconsistent application of the Plan's provisions violated ERISA's reporting, disclosure and fiduciary requirements are also unpersuasive.

regulations requiring that notification of a denial of benefits include a "description of any additional material or information necessary for the claimant to perfect the claim and the explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(1)(iii).  The regulation does not appear to have any application here, as it was the claimant, rather than the administrator, who was of the opinion additional information was necessary.  In denying the Plaintiffs' request for the employment records of IP employees not involved in this lawsuit, Renfrow articulated that the information requested was confidential and not relevant to the Plaintiffs' claims.  As the Plaintiffs' have failed to convince the Court that the decision was arbitrary and capricious, it will not be disturbed.

In sum, and for the reasons set forth herein, the Plaintiffs' motion for summary judgment is DENIED, and the Defendants' motion for judgment on the administrative record is GRANTED.  The Clerk of Court is hereby directed to enter judgment for the Defendants.

IT IS SO ORDERED this **20** day of April, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 45 in case 2:02-CV-02994 was distributed by fax, mail, or direct printing on April 21, 2005 to the parties listed.

---

Maurice Wexler
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ
165 Madison Ave.
Ste. 2000
Memphis, TN 38103

Bruce M. Steen
MCGUIRE WOODS, LLP
100 North Tryon St.
Ste. 2900
Charlotte, NC 28202

Carolyn Howard
NORWOOD HOWARD & ATCHLEY
1407 Union Ave.
Ste. 807
Memphis, TN 38104--362

Honorable J. Breen
US DISTRICT COURT